Anderson, J.,
delivered the opinion of the court.
This cause is brought here by the plaintiff in error, who was plaintiff in the court below, upon a writ of error to the judgment of the Circuit court of Frederick county. The case is briefly this : The plaintiff placed in the hands of Barton & -Williams, attorneys practicing law in the town of Winchester, large claims against one John Jolliffe, who resided in the city of Cincinnati, to be placed by them in the hands of other attorneys for collection. The debtor proved to be insolvent in Ohio, and the claims were returned. Barton & Williams were then employed by the plaintiff-, in the latter part of 1860 or early in 1861, to collect for him as much of said claims as could be made by attaching a legacy left to the debtor in this State. For this purpose they sued out from the Circuit court of Frederick county, in the name of the plaintiff-, a foreign attachment, returnable to April rules, 1861, and summoned Joseph Jolliffe, executor of Rebecca Jolliffe, as garnishee ; who came forward and admitted liability to the said John Jolliffe, under the will of his testatrix, for the sum of $1,000 ; and on the 21st of February 1862, paid to Barton & Williams, for the plaintiff, in Confederate States treasury notes, $1,028.50. Barton died in 1863, and this suit was brought against Williams, the survivor, on the 25th of January 1866, for $932.95, which he claimed out of the sum aforesaid, collected by his attorneys Barton & Williams. Upon the trial, the jury found a verdict for the defendant, upon which the court, overruling a motion for a new trial, rendered judgment against the plaintiff.
Barton & Williams deposited their client’s money for Mm, in the Bank of the Valley of Virginia, at Winchester ; which was then solvent. The bank afterwards *254 failed, and the money was lost. The question is, are they liable ?
^ wett-settled law, that the responsibility of attorneys is that of ordinary bailees. If they have acted to the best of their skill, and with a bona fide and ordinary degree of attention, they will not be responsible.
In this case there is no complaint of want of attention or skill in prosecuting the claim against Jolliffe, and in recovering so large a part of the debt against an insolvent debtor. But the complaint is, that they received payment in Confederate currency, and deposited it in a, bank, of which they gave the plaintiff no notice, which afterwards became insolvent, and the money was lost.
Let us examine these several grounds of complaint. And first, as to receiving Confederate money. The-proof is, that at the time the money was received, Confederate treasury notes were worth only ten per cent, less than gold, including exchange. That it was almost the only currency of the country, as good as any, and better than greenbacks, and that it was received and paid out by the banks, and was the currency generally, if not universally used, in all the transactions of life. That gold had ceased to be a currency, and was sold as a commodity; and that the attorneys could not have collected the debt at all, if they had refused to receive Confederate currency. The claim had been placed in their hands for collection, and it was their duty to collect it. They had not been instructed by their client not to receive payment in Confederate currency; and we are of opinion that it would be unreasonable to hold them responsible, under the circumstances, for having done so.
But if any liability had attached to them because of' their receiving Confederate money in payment, which we do not think can be maintained, they were relieved from it, by depositing the money in a solvent bank, for their client. The bank by its charter was bound to pay *255 the deposit in specie; and though that obligation was suspended by act of Assembly, it was still bound to pay in bank notes. So that it was a matter of indifference, what sort of currency the attorneys had received for their client. We think there is nothing in this objection.
But it is contended on behalf of the plaintiff in error, that the attorneys, by making this deposit in bank, ceased to hold the relation of bailees to their client, and thereby became his debtors ; and in that character, liable to them now for the amount so deposited. And in support of this position, they rely upon the case of Robinson v. Ward, 12 Eng. Com. L. R. 28. In that case, C. J. Abbott says : “There are three modes which a person may adopt, when the money of others is placed in his hands: 1st. To keep it in his own house.” If he does so, and does not mix it up with his own money for his own use, he is liable only as bailee. “ 2nd. To pay it into his bankers, "on his general account;” in which case he is liable, because there is no ear-mark, or anything to indicate that it is deposited as the clients’ money. On the contrary, such a deposit imports a deposit of his own money on his own account; and 3rdly, which the Chief Justice says is the correct mode, “to open a new account, in his own name, for this particular purpose.” In this case he says, “ he should have paid the money into a banker’s hands, by opening a new account in his own name, for the credit of Robinson’s estate, and so to ear-mark the money as belonging to that estate. Then it would have been kept separate.”
It is unquestionably true, that a fiduciary is liable only as bailee if he keeps the money which is in his hands for another, at his house, or in his pocket, separate from his own, and not mixed up with it. But the Chief Justice says, that is not the best way. The right way is, to deposit it with a banker, in the name of the fiduciary, for the credit of his client. It is better that he should deposit it in a solvent bank than to keep it at his own *256 house, because, in general, it is safer there. The law, we is correctly laid down by C. J. Abbott, in the ease cited.
Let us apply it to the case in hand. The attorneys, the same day they collected the money, made an entry on their collection journal, stating accurately the amount received, and for whom; namely, “Pidgeon,” the name of their client, the plaintiff. They deducted their commissions and fees, and the balance, $932.95, they enter, “deposited February 21, ’62.” The proof is, that the same day they deposited $932.95, not the whole amount they had collected, but Pidgeon’s part of it, separated from their own, in the Bank of the Valley of Virginia, at "Winchester. Not on their private account; (each of them had private accounts in said bank,) but tojhe credit of “ collection account.” And that this amount, so deposited, was entered upon the bank book, called the scratcher, and marked “Pidgeon.” This, it seems to me, comes substantially up to the requirement of the rule, as laid down by Chief Justice Abbott. They evidently did not appropriate a dollar of their client’s money to their own usé, by mixing it up with their own. They separated their own from it, as entered upon their collection journal, and set apart their client’s money to itself, which they deposited in bank, in their own name, for their client, ear-marked “ Pidgeon :” thus showing their purpose not to mix up this money with their own, but to set it apart from their own, and to deposit it in a safe and solvent bank, as their client’s money. The proof is, that the bank in which they made the deposit was in as good, if not better condition, than any bank in the United States ; that they kept their individual, private accounts in it, and had on deposit, to the credit of their general collection account, some $15,000, when the war ended, and the bank failed.
But it is contended for the plaintiff, that, inasmuch as the money so deposited, was mixed up by the bank with *257 its other moneys, the attorneys who had made the deposit, by this act of the bank, ceased to hold the relation of bailees to their client, and became his debtors, and are consequently liable to him for the whole amount. It is not easy to perceive how their relation of bailees ceased, when there was no mixture of their client’s money with their own for their use ; or how the bank, by mixing up the money deposited by the attorneys, as their client’s money, could change the relation of the attorneys as bailees to that of debtors. If an attorney deposits his client’s money in bank, as his client’s money, in a way that precludes him from demanding a return of the identical dollars or bank notes, or other notes of circulation, constituting currency, we cannot perceive how he thereby ceases to be the bailee of his client, and becomes his debtor. The whole difficulty is resolvable into this question, can an attorney only make a special deposit in bank of his client’s money, for his client, without making himself liable as debtor? "We can perceive no reason why a general deposit, any more than a special deposit, by an attorney of his client’s money, if deposited as his client’s money, can terminate the relation of bailee, and constitute him the debtor of his client. It is not the mixing up of the money by the bank with its own money, so that the identical dollars or notes deposited cannot be ascertained, which terminates the relation of the depositor as bailee of the person whose money he has deposited, and constitutes him his debtor; but it is the conversion or appropriation of the money to his own use which changes the relation. When money is deposited by a bailee for his bailor, the bank becomes debtor to the depositor for the amount deposited, in dollars, and in- general it would be advantageous to the person for whom the money was deposited, that it should be so mixed up with other moneys of the. bank that the identical notes deposited could not be ascertained, and that the deposit should have been so made *258 that the bank would not be entitled to return the identical money deposited. For as we have seen, this bank ^ barter, bound to pay its deposits in gold. But whether a general deposit be most to the advantage of .the client or not, the attorney depositing cannot be held liable as debtor to his client unless he has made the deposit as his own money, or in a way evidencing an appropriation to his own use ; as he does when he mixes the money with his own, or deposits in bank upon his private account, as his own money. But when he deposits it as the money .of his client, not upon his private individual account, indicative of an appropriation to his own use, but upon his general collection account, indicating that he has not appropriated it to his own use, and has an entry made upon the book of the bank denoting that it is the money of his client, in such case, he. cannot be regarded as the debtor of his client, because he has not converted or appropriated his money to his own use ; and there is no consideration to constitute the relation of debtor and creditor. The client’s money is there on deposit in bank, ready for him whenever called for. We are of opinion, therefore, that the deposit of the plaintiff’s money in bank, by Barton & Williams, his attorneys, as his money, does not evidence an appropriation of the money to their own use, and which it is evident from their whole transaction, they had no purpose to do ; and did not, therefore, constitute them debtors to their client, nor change their relation of bailees.
But it is further contended, that they have not discharged their duties as bailees, and have thereby become liable for the money which was in their hands. And this is claimed upon the ground, that they deposited the money in bank, and did not notify the plaintiff that it was there on deposit; and by reason thereof it remained in bank until the bank failed, and the money was lost. It is not pretended that the attorneys derived any profit from it; or that they are chargeable with mala fides; *259 but that they were guilty of such gross negligence as would make them liable.
"We are of opinion, that it is undoubtedly the duty of attorneys, when they have collected money for their clieuts, to give them notice, and to pay it over to them promptly, whenever called for or demanded. But if the client has notice of it, it is unnecessary for the attorneys to go through the unmeaning ceremony of giving him notice of what he was already informed. And even when the client is not informed of the fact, circumstances may excuse the attorney for the failure to give notice ; as, for example, if his client has left the country, or his whereabouts is not known to'the attorney, or he has not the means of communicating with him by reason of a state of war, the relations of one being with one of the belligerents, and of the other with the other belligerent, so that intercourse and intercommunication between them is interrupted. Now it seems that at the very time this money was received by the attorneys and deposited in bank, their client was out of the State, and the attorney knew not where, though he was in the State of Maryland. Of course the notice could not then be given him. It is also a fact of public history, that from that time until the failure of the bank, the district of country in which both of these parties resided was the theatre of a devastating war between the States ; and that it was sometimes under the dominion of one of the belligerents, and sometimes under the power of the other. It seems that the plaintiff was passingfrom Virginia to Maryland, and from Maryland to Virginia, according as one or the other belligerent was in the ascendant in the district of country where he and the defendant resided. When the Federáis were in the ascendant, he was frequently in "Winchester, was marketing there, and was frequently in the vicinity of Mr. Williams’ office and dwelling. There is no evidence in the cause that Barton or Williams ever saw him after the money was collected, or had auy notice *260 or information of his return from Maryland, where he was when the deposit was made in bank, so that they could give him.notice. But if they were aware of his return, they had every reason to believe that he was informed of the collection and deposit of the money for him ; especially as it was the general usage in that section for clients who lived in the neighborhood of Winchester, and whose business or other relations frequently brought them there, to call upon their attorneys to enquire about claims which had been placed in their hands for collection. He having employed the agency of this firm to have these claims collected in Ohio, which proved unavailing on account of the insolvency of his debtors, and afterwards, as early as sixty-one, having employed them to proceed by foreign attachment to subject a legacy due his debtor in Virginia, it is natural that his attorneys should presume, in this state of the case, from his not coming to enquire about it, either that he was already informed of it and did not wish to take the money out of bank, or that he continued out of the country. But this was a question of fact properly cognizable by the jury; and it was proper for them to consider the facts and circumstances, and to decide what weight should be attached to them.
The fact that the executor of Rebecca Jollifle had funds in his hands belonging to his debtor, was known to the plaintiff; and he employed Barton & Williams, his attorneys, to institute a foreign attachment to subject them to his debt. And he was doubtless aware that they sued out an attachment in his name for that purpose. How far the motives and principles which usually actuate and govern men would have prompted the plaintiff to enquire as to the result of that proceeding, if not of his attorneys, of others who could inform him ; and having had so many opportunities, by walking a few steps, to enquire of his attorneys in relation to it, how far his not having done so would justify the conclusion that he *261 knew all about it, and needed no further information, and that he did not call for the money because he did not want it, and preferred to wait until the troubles of the country were over before he called for it, we are of opinion that all these facts and circumstances and enquiries properly belonged to the province of the jury, and that it was for the jury to weigh them and to draw their conclusions from them ; and we cannot say that their conclusions were erroneous. On the contrary, we are of opinion that their conclusions were just and right, and that they do raise a presumption, amounting almost to moral certainty, that the plaintiff was informed as to the state and condition of his debt.
The only remaining question is as to the admissibility of evidence, which was excepted to by the plaintiff. We think it would have been competent for the defendant to have proved by oral testimony, that when he deposited the money in bank, he instructed the bank officer to credit it to Barton & Williams’ general collection account, for Pidgeon, and that it was so entered on the book of the bank called the “ scratcher and that the witness might refer to the book before, or at the trial, to refresh his memory.
But it seems that the witness’ memory was not revived by referring to the book, and that he spoke not from memory but from the entry, which he had seen in the book at a previous trial, and which be knew to be in his hand writing. The book itself was the best evidence to prove its contents; and secondary evidence was incompetent to prove it, unless the non-production of the book was satisfactorily accounted for; which ought to have been shown before the evidence of its contents was given to the jury. But it seems that this was not done until after-wards. The judge admitted the evidence, under an erroneous impression, that the fact which was relied on to excuse its non-production, had been proved, or admitted. The error was soon discovered, and the judge then heard *262 the preliminary evidence, after the evidence in chief had been given to the jury; to which the plaintiff excepted. the question now, is, was this error ? After the error was discovered, either party might have moved the c°urt to exclude it, and after it was excluded from the jury, it would have been competent for the defendant then to offer the preliminary evidence to account for the absence of the book; and this being satisfactory to the court, he might then have introduced the same evidence in chief of the contents of the entry, which it would not have been error in the court to admit. "What the court did was substantially, and in effect the same. "We 'are, therefore, of opinion that there is no substantial error in the ruling of the court, as shown by the second bill of exceptions, which cured the previous error, that the court, it seems, had fallen into from misapprehension.
For the foregoing reasons, we are of opinion to affirm the judgment of the Circuit court
Judgment aeeirmed.